## CHARLESTON.

WEBSTER WAGON CO. *r.* HOME INSURANCE CO. AND PETERSON.

Submitted June 4, 1885.—Decided December 8, 1885.

1. The return of a sheriff, that he had served a writ on a foreign insurance company doing business in this State by serving it on its "lawful attorney," is *prima facie* a good service of the writ and gives to the court jurisdiction to render a personal judgment against such foreign insurance company. The words "lawful attorney" on such return are regarded *prima facie* as meaning the attorney, on whom the statute-law authorizes such process to be served, and the service upon whom is declared to be equivalent to service on such foreign insurance company. (p. 321.)

2. When in a common law suit a jury is waived, and the case is submitted to the decision of the court by consent of parties, and the court hears a part of the evidence and then continues the case to the next term of the court, when it hears the balance of the evidence and decides the case on the whole evidence, neither party objecting to its so doing, such judgment will not be reversed for the only reason, that the evidence was submitted at two different terms of the court. · *Quœre:* Would it be reversed for this cause only, even had the party asking its reversal objected to this action of the court below and asked, that the whole case be heard *de novo* at the term of the court, when it was decided, and his objection to the court considering evidence offered at two different terms entered of record? (p. 324.)

3. If in an attachment suit against a non-resident defendant the writ is served on him, and a personal judgment is rendered against him, and afterwards the amount due from the garnishee is judicially ascertained to be less than this judgment against the non-resident defendant, such garnishee should be ordered to pay the amount of his indebtedness directly to the plaintiff as a credit on his judgment and ought not to be ordered to pay it to a receiver, and the receiver ordered to pay it to the plaintiff on his judgment against the non-resident defendant. (p. 326.)

4. If there be a suggestion, that the garnishee has not fully disclosed his indebtedness, and the amount found on the trial to be due from him be ascertained finally to exceed the amount he confessed, there should be included in the judgment against him the costs of such trial. (p. 328.)

5. Though the indebtedness of the garnishee to the non-resident defendant be such, that the defendant could not sue without first making a demand upon him, yet, though no such demand has

been made upon him, he may nevertheless be summoned as a garnishee, and a judgment may be obtained against him as such. (p. 334.)

6. A contingent debt though arising out of a contract can not be garnished. As it would be unjust to the garnishee to render a judgment against him on a contract, when the amount apparently due may according to the terms of the contract be extingnished by subsequent events. But though for their convenience the garnishee and the non-resident defendant keep books in such a way that the amount apparently due at any time on their books by the garnishee may be decreased by further enquiry into existing facts, such a debt is not properly speaking contingent, and its payment may be enforced by proceedings against him as a garnishee. (p. 335.)

Statement of the case by GREEN, JUDGE:

On July 7, 1882, The Webster Wagon Company brought an action of *assumpsit* in the municipal court of Wheeling against the Home Insurance Company of Columbus, Ohio, and in the summons issued the damages were laid at $2,000.00. The summons was in proper form and is signed by the clerk of said court and addressed to the sergeant of the city of Wheeling. The following is his return on said summons:

"I served the within writ within the city of Wheeling as to the Home Insurance Company of Columbus, Ohio, by delivering a copy thereof to William F. Peterson, its lawful attorney, he being a resident of the city of Wheeling, this 8th day of July, 1882, at 10 o'clock A. M.

"CALEB SYLVIS, D. S.,
"*For Thomas D. Bennett, C. S.*"

On the same day oath was made by the treasurer of the Webster Wagon Company before the clerk of said court in his office, that the plaintiff in said suit was entitled to recover in said action $1,363.64 with interest thereon from June 29, 1882, till paid, the claim being for a loss by fire occasioned on the night of April 20, 1882, destroying and injuring certain property of the plaintiff, which was insured by a policy of insurance issued by the defendant April 2, 1882; which insured said property against loss and damage by fire; and that the defendant was a foreign corporation. Upon this affidavit being filed the clerk of said court issued an attachment in proper form against the personal estate of said defendant

sufficient to pay $1,363.64 with interest thereon from the 29th day of June 1882, till payment and the costs of this suit. This attachment was endorsed by the plaintiff's attorney, that the plaintiff designates William F. Peterson of the city of Wheeling as indebted to the within named defendant, The Home Insurance Company of Columbus, Ohio, and as having in his possession and under his control money and effects of the within named defendant, The Home Insurance Company of Columbus, Ohio. Thereupon on the same day July 7, 1882, the clerk of said court issued the usual garnishee summons requiring said William F. Peterson to appear at the next municipal court of Wheeling and disclose on oath in what sum of money he is indebted to the defendant, The Home Insurance Company of Columbus, Ohio, and what effects and money of said defendant he had in his possession or under his control. This summons was duly served on this garnishee on July 8, 1882, at 10 o'clock A. M. At July rules the declaration in this suit was filed. The defendant failed to appear; and a judgment was regularly taken against it on August 26, 1882, as follows:

" This day came the plaintiff, by its attorneys, and the defendant who was duly summoned, being solemnly called, came not, thereupon it is considered by the court that the judgment entered in the clerk's office of this court against the said defendant stand confirmed. No jury being required by the parties, the court proceeded in lieu of a jury to ascertain the amount that the plaintiff is entitled to recover against the defendant in this action, and having heard and considered the evidence, doth consider that the plaintiff recover against the defendant the sum of $1,377.27, (thirteen hundred and seventy-seven dollars and twenty-seven cents) damages, aggregate amount of principal and interest to August 26, 1882, with interest on said sum of $1,377.27 from August 26, 1882, until paid, and its costs by it about its suit in this behalf expended."

On September 2, 1882, William F. Peterson failing to appear as garnishee as required, a rule was issued against him returnable to the first day of the next term. He then appeared on November 18, 1882, and filed two statements of his indebtedness to the Home Insurance Company, of Columbus,

Ohio, one showing a balance due from him of $203.74 and
the other showing that there was a balance due from J. C.
Alderson an insurance broker of Wheeling to W. F. Peter-
son from premiums due to this insurance company, the two
together making $430.64.; but he said that these statements
were not correct or complete. Upon his examination on oath
and producing these statements and making these answers,
it was suggested by the plaintiff, that he had not fully dis-
closed the debts due by him and the effects in his hands of
the defendant, and thereupon it was ordered, that a jury be
impanelled to enquire as to such debts and effects as were
owed by said Peterson to said defendant or as were in his
hands or under his control at ten o'clock on July 8, 1882, and
since that date, and a verdict render of the amount, value and
character of such debts and effects, upon which enquiry the
plaintiff herein should have the affirmative.    The trial of the
issue was continued. After various continuances at a session
of the court held June 12, 1883, a jury was waived by the
parties, and the matters involved were submitted to the court
for hearing.    The evidence was partly heard, and the further
hearing thereof was continued till July 9, 1883.  On that day
by consent it was further continued till July 17, 1883, that
being the second day of the next term of the court, when the
case was set for trial. On that day on motion of the garnishee,
W. F. Peterson, and on his oath, that he could not go to trial
in the absence of his witness, J. C. Alderson, the case was
continued till August 27, 1883, when it was again set for
hearing.    On August 27, 1883, the case came on to be further
heard, W. F. Peterson being present, and the court proceeded
to hear further testimony in the matter, and having fully heard
the evidence and the arguments of counsel the court not being
advised of its judgment herein took time to consider thereof,
and on December 17 the court rendered its judgment, which
was entered as follows :

" This day came again the plaintiff, by its attorney, and W.
F. Peterson, garnishee, by his attorney, and the issue here-
tofore made as to whether the said Peterson, by his answer of
November 18, 1882, fully disclosed his liability to said de-
fendant, having been by consent submitted to the court in lieu
of a jury, and the evidence and arguments being heard, the

court doth find that on July 8, 1882, the date of service of the process of garnishment, the said W. F. Peterson was indebted to said defendant in the sum of $475.00 (four hundred and seventy-five dollars.) It is therefore considered by the court that the said plaintiff, the Webster Wagon Company, recover against the said W. F. Peterson the said sum $475.00, together with the costs by it expended in the trial of this issue, the said sum of $475.00, to be applied for and towards the satisfaction of its judgment against the said defendant, rendered on August 26, 1882, the said garnishee W. F. Peterson excepted to the said judgment against him, and tendered his bill of exceptions thereto praying that it be signed, sealed and made part of the record, which is accordingly done."

The following is the substance of this bill of exceptions. "The following facts were proved:

"The said Peterson for several years before the transactions hereinbefore mentioned, and during the time of such transactions, was the agent at Wheeling, West Virginia, of the Home Insurance Company of Columbus, Ohio, and was also the general agent for West Virginia of said company, having power as such agent to issue policies binding the company. Such policies were sent to him by the company in printed forms, signed by its president and secretary, containing blanks to be filled in writing, and by their terms were to be valid only when countersigned by said Peterson, agent at Wheeling; all the policies of the said company hereinafter mentioned were written in such printed forms, which were in the words following:"

Then follows a form of a policy in which appears this clause: "In case of surrender and cancellation of the policy by the assured, or cessation of the risk otherwise than by fire, a return premium will be made, if applied for within thirty days thereafter, the company retaining the short period rate of premium for the expired time."

Then follows this statement: "During the time aforesaid, J. C. Alderson was an insurance-broker, doing business in the city of Wheeling, who in the course of his business applied to the said Peterson for insurance for the benefit of some of Alderson's customers, and obtained from said Peterson many policies for their benefit, some of which were policies

of the said Home Insurance Company. Peterson also did a brokerage business and in like manner obtained from Alderson for Peterson's customers policies of insurance issued by companies for which Alderson was agent. A running account was kept between Peterson and Alderson, which after March 1, 1882, when there had been a settlement between them, is in the words and figures following:"

Then follows a long account between W. F. Peterson and J. C. Alderson, and a long account, or rather memorandum, intended to show the transactions between Peterson and Alderson during that period, so far as they relate to the policies of The Home Insurance Company. After these accounts the bill of exception proceeds:

"The universal method of doing business between insurance companies and their agents, and the invariable course of business between The Home Insurance Company and Peterson, as its agent, was that the agent was charged with the amounts of premiums on all policies of the company issued by or through him, but subject to the understanding that if any policy should not be accepted by the person applying for insurance, or if such person shall prove unable to pay the premium, or if such policy should be cancelled before its expiration, the agent should have credit for the whole premium or the unearned premium as the case might be. The like method of keeping accounts is usual between brokers and agents, and was followed by Peterson and Alderson. The facts aforesaid, except the details of the accounts between Peterson and Alderson, were known to The Home Insurance Company. Some time in June, 1882, and before this action was brought or any attachment issued, Alderson suspecting that The Home Insurance Company, the defendant, was insolvent, said to Peterson, the agent of that company, that he (Alderson) would cancel all the policies of that company which he had received from Peterson, and which up to that time had remained in force, and would turn the policies over to Peterson as fast as he (Alderson) could get them up from his customers. To this Peterson then assented that that should be done. The usual custom between insurance companies, insurance brokers and their customers is that the broker shall represent the customer, and may act for him in

the cancellation of his policy, substituting another policy for one which may be cancelled. Alderson in notifying Peterson as aforesaid was acting in behalf and for the benefit of those who held policies of the defendant, The Home Insurance Company from Alderson through Peterson. Those policy holders ratified what Alderson had done, and in accordance with his action, such policies were sent in by their holders at dates which, so far as they are known, are shown in the following account :"

Then follows an account of policies issued by The Home Insurance Company of Columbus, Ohio, from July 1, 1881, to July 1, 1882. Total premiums for the year were $895.45, and deducting commissons, $179.08, left a balance of $716.37. Then follows a list of policies cancelled in May and prior to July 1, 1882, and subsequent to July 1, 1882, and in August of that year. Then follows the following in this bill of exceptions :

"The amount of such charges after July 7, 1882, was $225.48 being the amount of premiums on policies refused and returned after that date and of unearned premiums on unexpired policies covered by the agreement between Peterson and Alderson but sent in after July 7, 1882.

"There also appeared in evidence with respect to these policies the facts set forth in the following account :"

Then follow many memoranda not deemed necessary to state, and which to a considerable extent are unintelligible, and also a large number of entries concerning policies involved in this case as found in a book kept by Peterson called "record of assured" and which book contains many erasures and alterations. These entries I deem it unnecessary to copy. This bill of exception then concludes thus : "The foregoing being all the facts, &c. proved at the trial, and the court having rendered judgment against W. F. Peterson garnishee, as set forth in the record, the said W. F. Peterson excepted and tendered this his bill of exceptions, praying that the same be signed, sealed and made part of the record, which is accordingly done."

From this judgment of the municipal court of Wheeling, rendered on December 17, 1883, William F. Peterson has obtained from a judge of this Court a writ of error and a *supersedeas*.

Opinion by GREEN, JUDGE:

This was an action of *assumpsit* brought by the Webster Wagon Company against The Home Insurance Company of Columbus, Ohio, to recover $1,363.64, with interest from June 28, 1882, till paid, due it on a policy of insurance against fire on certain property, which was destroyed or injured by fire on April 20, 1882. The defendant was a non-resident of this State, and as such an attachment was issued against it regularly at the time. The suit was instituted; and the plaintiff in error, William F. Peterson, the principal agent of the defendant in this State, was suggested as a person indebted to this non-resident defendant, and as having in his possession or under his control money and effects of the absent and non-resident defendant. He was accordingly summoned at once to appear at the next municipal court of Wheeling, that being the court in which suit was brought, to disclose on oath in what sum he was indebted to this non-resident defendant, and also to state what effects and money of said defendant he had in his possession or under his control. There was no publication against The Home Insurance Company of Columbus, Ohio, as a non-resident defendant. It was a foreign insurance company doing business in this State and was by our law (Warth's Code, ch. 34, sec. 15, p. 235) required by power of attorney to be filed in the office of the Auditor of the State to appoint a resident of this State to accept service of process and notices in this State for the company on whom all processes and notices could be served to have the same effect, as though served on the company. So that notice need never be published against a foreign insurance company doing business in this State as a non-resident; as under this law such foreign corporations have a lawful attorney resident in this State, on whom all process and notices may be served; and such service operates just as though the service was on the foreign insurance company. Who this resident lawful attorney is may be always ascertained by calling at the Auditor's office.

In the case before us there was no publication against The Home Insurance Company of Columbus, Ohio, as a non-resident defendant; but it is claimed by the plaintiff, The Webster Wagon Company, that the summons in this action

of *assumpsit* in the municipal court of Wheeling was regularly served on The Home Insurance Company of Columbus, Ohio, by the delivery of a copy thereof to William F. Peterson, its lawful attorney, upon whom process could properly be served, on July 8, 1882, said copy having been so delivered to said Peterson by the sergeant of the city of Wheeling, of which city Peterson was a resident.

The municipal court of Wheeling having acquired jurisdiction in this case proceeded regularly with it till August 26, 1882, when it rendered judgment for the plaintiff against the defendant for the sum of $1,377.27, with interest thereon from August 26, 1882, till paid, and its costs about this suit expended. It is claimed, that this judgment is a mere nullity, and that it must follow that the judgment subsequently rendered on December 17, 1883, in favor of the plaintiff against the garnishee, W. F. Peterson, for $475.00, to be applied for and towards the satisfaction of its judgment against The Home Insurance Company of $1,377.27 aforesaid, must also be declared a nullity. It is true that this last judgment of $475.00 against W. F. Peterson must be null and void, if this judgment, on which it was to be paid, was a nullity. Thus it was held in *Railroad* v. *Todd*, 11 Heisk. 549, that, if the defendant has not been notified of the attachment either actually by service or constructively by publication, any judgment against a garnishee in such attachment case would be void. It is claimed that the judgment against The Home Insurance Company was a nullity, because the municipal court of Wheeling had no jurisdiction to render such judgment, the process, whereby this suit was commenced, in which this judgment was rendered, never having been served on the defendant nor any publication made. The return on this process made by the sergeant of Wheeling is that he served the within writ within the city of Wheeling as to The Home Insurance Company of Columbus, Ohio, by delivering a copy thereof to William F. Peterson, its lawful attorney, he being a resident of Wheeling, on July 8, at 10 o'clock A. M. It is claimed by the plaintiff in error that this was no service, because the return simply says, that William F. Peterson was the lawful attorney of the defendant, and by lawful attorney might have been meant, that he was their

attorney-at-law, or attorney to collect rents, or any other sort of attorney, as readily as it might have meant their attorney to accept service of process or on whom process could be served under sec. 15 of ch. 34 of Code (Warth's Code, p. 235).

Is this position tenable? It seems to me, it is not. This provision of our law requires every foreign insurance company doing business in this State, such as the defendant, to appoint by a duly authenticated power of attorney filed in the Auditor's office an attorney, upon whom all writs may be served as the equivalent of personal service of the writ on the defendant, such foreign insurance company. When therefore a sheriff or other officer returns, that he has served a writ on a foreign insurance company doing business in this State by leaving a copy of it with its lawful attorney, we must understand this return as meaning, that he had served the writ on such a lawful attorney of the defendant, as the law authorized him to serve a writ upon. This seems to be the *prima facie* meaning of such a return. And while it is possible he may not have been such an attorney, yet if there was no plea in abatement filed in the case, and the court took jurisdiction of it as of a case, in which the writ had been properly served, and rendered a judgment in the case accordingly, such judgment can not be treated as a nullity. The plaintiff in error, who now insists on this judgment being regarded as a nullity, had a perfect right as garnishee to object to the rendition of this judgment against The Home Insurance Company, if this writ was really served on him, as the return says it was, and he was not the lawful attorney of said company appointed under the statute-law, on whom writs could be served. No plea in abatement or other objection was interposed by him to prevent the rendition of this judgment; and it seems to me to be out of the question to permit him in this Court for the first time to assert, that the writ was not properly served, when on its face it appears to have been properly served, if we give to the return of the officer on the back of the writ its natural meaning.

By lawful attorney of the defendant used in such return would be naturally meant not attorney at law or attorney to collect or any other sort of attorney except attorney, on whom to

serve process, such as the law requires the defendant to have residing in the State for that purpose. The language used taken in connection with its endorsement on the back of a writ by an officer as a return, if it does not mean absolutely " lawful attorney " on whom to serve process, certainly means this *prima facie*. It was the duty of the municipal court to interpret this return, and it has done so and has decided, that it meant the writ was served on the lawful attorney of the defendant, on whom process could be lawfully served. Now even if the municipal court erred in its judgment, inasmuch as it was its duty to determine whether on this return it had jurisdiction of the case, no court can treat its judgment as a nullity. Even if it did err, the judgment could only be set aside as erroneous upon proper proceedings being instituted for that purpose. [*Miller* v. *Brickerhoff*, 4 Denio 118 ; *Staples* v. *Fairchild*, 3 Conn. 46 ; *Den* v. *Turner*, 9 Wheat. 541 ; *Regina* v. *Bolton*, 1 Ad. & E. 71, (41 Eng. C. L. R. 442) ; *Mayer* v. *Adams, supra*, 244.).

But we think the municipal court of Wheeling did not err in its judgment on this point ; and the judgment which was rendered by the municipal court of Wheeling in favor of The Webster Wagon Company against The Home Insurance Company of Columbus, Ohio, is not only not a nullity but, so far as the record shows, is a binding and just judgment.

But, it is argued, that, though the judgment for $1,377.27 in favor of The Webster Wagon Company against The Home Insurance Company rendered August 26, 1882, was a valid judgment, still the judgment rendered afterwards, on December 17, 1883, in favor of The Webster Wagon Company for $475.00 against W. F. Peterson to be applied as a credit on the first judgment must be regarded as a mere nullity, having been rendered by a court, which had no jurisdiction to render such a judgment. This want of jurisdiction, it is claimed, exists for two separate and distinct reasons, either of which, it is claimed, was fatal to this jurisdiction of the municipal court of Wheeling in rendering any such judgment in December, 1883. The first of these reasons is, that the municipal court of Wheeling commenced the trial of this case against the garnishee, Peterson, at the June term, 1883, when a jury was waived by the parties, and the matters involved were sub-

mitted to the court, and the evidence was partly heard by the court on June 12, 1883, and the further hearing thereof was continued till July 9, 1883, without the consent of Peterson, so far as the record shows. This continuance was not simply to a future day of the then term but was to a day fixed in the succeeding term. On July 9, 1883, it was with the consent of the parties and the assent of the court again continued till another day, July 17, 1883, in another term of said court. It was then continued on the motion of Peterson, the plaintiff in error, to August 27, 1883, when it was set for hearing. All the rest of the evidence was then heard, and the case was argued and submitted to the court, who in deciding it considered not only the evidence submitted at the August term, 1883, but also the evidence, which had been submitted two terms before that on June 12, 1883.

It is insisted, that this was irregular, the court having no authority to decide such a case upon evidence submitted at any term except that, in which the case went into the hands of the court for its decision; that no trial of an action at law, such as this was, though a jury be waived by the parties, can take place partly at one term and partly at another.

If the record had shown, that the plaintiff in error, Peterson, had insisted, when this trial was resumed on August 27, 1883, the court should then proceed to hear the case *de novo* and should exclude from its consideration any evidence, which had been previously introduced on June 12, 1883, and the court had refused to do so and against the protest of the plaintiff in error had decided the case on evidence submitted at two different terms, he would, it seems to me, have a right to object to a judgment thus rendered against him in a common law suit. But the record does not show, that he objected to the consideration by the court in reaching its conclusion of all the evidence in the case whether produced at the June or August term of the court. On the contrary the fair inference from the record is, that both parties were willing, that in reaching its conclusion all the evidence whenever submitted to the court should be considered by it; and when a bill of exceptions was taken, and all the facts were certified, no sort of distinction was made or asked to be made between the facts proven in June, 1883, and those proven in August,

1883. Under such circumstances it does seem to me, that both parties have waived this irregularity in the trial of the case, if such it was. It was doubtless done for the accommodation of the parties, who in the particular case seem to have thought, that no loss would likely result to either party from thus hearing a part of the evidence at one time and the rest at another time. My opinion is, that objection to this mode of proceeding can not be taken for the first time in the appellate court.

But it is claimed by the counsel for the plaintiff in error, that by secs. 14 and 16 of ch. 106 of the Code, (Warth's Code, ch. 106, secs. 14 and 16, p. 651,) in force, when this judgment of December 17, 1883, was rendered, provided that upon his confession of indebtedness or upon the verdict of a jury the court may order the garnishee to pay the amount so due from him to such person, as the court may appoint receiver; and that the court had no authority, as it did, to render a judgment that the garnishee, Peterson, do pay the amount due from him, $475.00, to The Webster Wagon Company, the plaintiff, to be credited on the judgment, which it had already obtained against the non-resident defendant. Precisely such a judgment against the garnishee was rendered in *Joseph* v. *Pyle et ux.*, 2 W. Va. 449; and Maxwell, judge, after a review of the Virginia authorities showed, that just such judgments had been frequently affirmed by the court of appeals of Virginia. The fair inference to be drawn from the numerous Virginia cases, which were referred to by Judge Maxwell, is that this was the usual mode of the entering judgment against the garnishee, when a judgment had already been rendered against the non-resident defendant. It does not at any time appear to have occurred to any parties in Virginia, that there was any objection to the rendition of the judgment against the garnishee in this form, if the judgment had already been rendered against the non-resident debtor. The obvious reason, why sec. 17 of ch. 151 of the Code of Virginia of 1860, the same as sec. 14 of ch. 106 of Code of West Virginia, (Warth's Code p. 651) directed that the amount due from the garnishee might be ordered to be paid to a receiver, was the fact, that the amount due from the garnishee might be by him confessed or established by the verdict of a jury, before there had been

any judgment against the non-resident defendant in favor of the plaintiff, and before it had been ascertained, whether any and if any what amount was due from the non-resident defendant to the plaintiff.   In such case it could not of course be paid to the plaintiff but must be paid to a receiver to be paid over to the plaintiff or to the non-resident defendant in whole or in part, as should afterwards appear to be just.  But if the amount due from the non-resident defendant had been already judicially ascertained to exceed the amount due from the garnishee, it is difficult to imagine a reason, why the garnishee should be required to pay it to a receiver to be by him paid to the plaintiff.   Such a judgment, as was entered in this case, ordering the garnishee to pay the amount he owed directly to the plaintiff as a credit on his judgment against the non-resident, saves much trouble, time and expense and produces the same result.

It is claimed that the court ought on December 17, 1883, to have ordered the garnishee, Peterson, under sec. 14 of ch. 106 of Code of West Virginia (Warth's Code, p. 651,) to pay the amount due to a receiver, who ought to have been at the same time ordered to pay the amount to the plaintiff.   Now this admission of the power of the municipal court of Wheeling to make this order on December 17, 1883, and the claim that it was its duty to do so makes it clear to my mind, that it not only had the power to do what it did do, order the money found due from the garnishee to be paid directly to the plaintiff on its judgment, but that this was the usual and proper mode of making the order, and that the right to make this order existed entirely independently of the wording of sec. 23 of ch. 151 of Code of Virginia, 1860.   And though Judge Maxwell in the said case of *Joseph* v. *Pyle et ux.*, 2 W. Va., 454–5, justifies this order, that the garnishee do pay the amount found due from him directly to the plaintiff as a credit on his judgment, when the amount is less than the judgment of the plaintiff against the non-resident, yet this sec. 23 of ch. 151 of Code of Virginia, had never been before referred to in order to justify such order, but it always had been treated, as if it were obviously proper.   This section has been changed in language.   See Code of West Virginia, ch. 106, sec. 20, (Warth's Code, p.  652); and the reasoning

of Judge Maxwell before referred to, so far as it is based on the language of this twenty-third section, is no longer applicable. But, as I have said, independently of this twenty-third section, if the court could, as is admitted, order the garnishee to pay what he owed to a receiver, and could at the same time order the receiver to pay the amount so received to the plaintiff on his judgment, then it would follow of course, that the court not only had the power but it was its duty to order what the garnishee owed to be paid directly to the plaintiff on its judgment. It follows of course, that the change in the language of sec. 23, of ch. 151 of the Code of 1860, can in no manner affect both the right and duty of the court in this case to have the judgment against the garnishee entered up in favor of the plaintiff credited on its judgment.

The plaintiff in error, the garnishee, objects, that judgment was rendered against him for costs. It is true the record of November 18, 1882, in the municipal court of Wheeling, fails to show, as it ought to have shown, what amount this garnishee, Peterson, admitted was due from him to the non-resident defendant; and only says, that the plaintiff suggested he had not fully disclosed his indebtedness; but this defect was supplied by the admission made by the garnishee in his examination as a witness beforethe court subsequently, that on November 18, 1882, he had admitted an indebtedness to the non-resident as defendant of $203.74, exclusive of what he had charged to J. C. Alderson and treated as so much cash received by him, Peterson, that is, $226.34, which together would make $430.08; and as the judgment rendered by the circuit court against him on December 17, 1883, upon the contest between him and the plaintiff exceeded that sum, being $475.00, the court properly adjudged the costs of this contest against him, though there is no express provision in the statute-law for adjusting costs against him. Yet on admitted general principles the costs should be adjudged against him as the unsuccessful party in this contest.

It only remains to enquire, whether on the evidence and facts set out in the bill of exceptions the court was justified in rendering this judgment of $475.00 against Peterson. He by

his counsel insists, that this $475.00 included $225.48 in the hands of Peterson which had belonged to the non-resident defendant, but which ceased to belong to it on June 30, 1882, as at that time he agreed with Alderson, that he might cancel all the policies for different persons, which he (Alderson) as a broker had taken out in The Home Insurance Company through the agency of Peterson; and by the terms of these policies, if they were cancelled and The Home Insurance Company was so relieved of its obligations, then it would have to refund these different parties various sums amounting in all to $225.48. The counsel of the defendant in error deny, that this $225.48 was included in the judgment of $475.00 rendered against Peterson. As the books and papers set out in the bill of exceptions are to a large extent mere memoranda very difficult, if not impossible, to be understood without personal explanations of their meaning, which is not included in the record, I can not say, whether this $225.48 is or is not included in this judgment of $475.00. But fortunately it is not necessary, as I understand the case, to determine this question; for in my judgment it ought to have been included, and if it was not, it was an error in the court below in favor of the plaintiff in error, and of course he can not complain thereof in this Court.

As I understand the facts set out in the statement of the case and the proper deduction from the facts, that are stated, the question, whether this $225.48 ought or ought not to have been charged against the garnishee, Peterson, will depend upon the law as applicable to these facts. In all the policies issued by this non-resident defendant there was a clause, which provided, that "in case of surrender and cancellation of the policy by the assured, or cessation of risk otherwise than by fire, a return premium will be made, if applied for within thirty days thereafter, the company retaining the short rate premium for the expired time." That is, any person assured might at any time withdraw or surrender on cancellation of its policy; and when any one insured chose to do this, the company would return the premiums, which it had received from the assured, retaining however so much of such premium received, as would compensate the company for the risk it had already run; and in

42

calculating this risk the assured would be charged what was called the short-period rate of premium.

Alderson, as broker, had obtained from Peterson, as agent for this Home Insurance Company, sixteen different policies for as many different parties scattered over the State and had sent them their several policies. On June 30, 1882, being apprehensive and justly so, that The Home Insurance Company was insolvent, Alderson determined to advise all his sixteen customers to withdraw their assurances from this company and take back their return-premiums, which according to their policies they had a right to demand of the company on the cancellation of their several policies; and on that day, June 30, 1882, he told Peterson, the general agent of the company in Wheeling, that he would turn these policies over to him for cancellation as fast as he could get them up from his customers. None of these customers had authorized Alderson to act for them in the cancellation of their policies; but Alderson claimed, that he could thus cancel these policies, because it was a usual custom between insurance-brokers and their customers for the broker to represent the customer and act for him in the cancelling of policies and in substituting other policies for those thus cancelled. There was no evidence that any of the customers of Alderson ever heard of such a custom, and as each of them retained his own policy, the legal conclusion must be, that Alderson had no authority to cancel any of these policies on June 30, 1882. As I understand the facts he did not attempt to do so. What the bill of exceptions says on this subject is:

"He said to Peterson, the agent of the company, that he (Alderson) would cancel all the policies of the company, which he had received from Peterson, and which up to that time had remained in force and would turn the policies over to Peterson as fast as he (Alderson) could get them up from the customer. To this Peterson then assented that that should be done."

This I regard as a mere statement made by Alderson, that he would get these policies from his customers, as fast as he could, and surrender them to Peterson for cancellation. And when he did so, under the provision of the policy, which

I have referred to, it became the duty of the company by Peterson its agent to cancel these policies and return to the holders of them or their agent, Alderson, the return-premiums before referred to.    The assent of Peterson to this I consider as amounting legally to nothing, for those assured had a right by the provision of their policy to cancel these policies whenever they chose; and when they did so, the company owed them the amount of this return-premium a sum calculated from the amount insured and the length of time the insurance had continued.    Neither the company nor the agent Peterson had any choice in this matter.    They were bound to receive back these policies, cancel them and pay the insured a sum certain, whenever any insured person chose to return his policy.    There was then no contract of any sort made by Peterson and Alderson on June 30, 1882. Nor did they then so understand it.

The first of these policies was returned on July 10, 1882. The return-premium on it was $25.00, in which amount The Home Insurance Company of Ohio immediately on the return of the policy for cancellation became indebted to the holder of the policy or to Alderson his agent.    In like manner between July 10 and September 1, 1882, fifteen other policies were returned by Alderson as agent of the insured to Peterson the agent of the company for collection.    The whole amount of the return-premiums, which these sixteen parties together became entitled to during that time, was this $225.48 the subject of dispute.    But if I am right, no part of this was due from the Home Insurance Company or Peterson their general agent till after July 10, 1882, when the first of these policies was returned for cancellation.    As the garnishee-summons was served on Peterson as a debtor of The Home Insurance Company on July 8, 1882, of course they were debts and liabilities incurred by this company and its agent Peterson after the service of the garnishee-summons in this case on Peterson, and of course he could not use any of the funds in his hands, which he owed to the company for premiums he had received for the company, to pay any of these liabilities incurred subsequent to July 8, 1882, as the plaintiff in this suit from that date had a lien on all, that he then owed to the company, and all assets of the company then

in his hands.    If therefore·he was charged, as claimed by the
attorney for the plaintiff, with the whole amount of his in-
debtedness to the company on July 8, 1882, without deduct-
ing this $225.48, no wrong was done him; for out of this in-
debtedness he had no right to pay any of these return premi-
ums, which made up this $225.48.    The conversation he had
had with Alderson on June 30, 1882, imposed on him no ob-
ligation to pay any part of this $225.48.    The credits given
by Peterson to Alderson were accordingly given as of the
time these several policies were returned and cancelled,
though by an endorsement on them an effort is made by the
parties to get these credits to date as of June 30, 1882, when
this conversation took place between Peterson and Alderson.
As a sample of these endorsements this is the endorsement
on the policy of August Hartfe, of Steubenville, Ohio, which
was a policy for $2,500.00, which expired October 1, 1882 :
" Policy cancelled by verbal agreement June 30, 1882, be-
tween J. C. Alderson and W. F. Peterson, agent Home In-
surance Company.    Cancelled July 24, 1882; no policy re-
turned."    This endorsement is self contradictory.    In one
part it states that the policy was cancelled June 30, 1882,
which was before the garnishee-summons was served on
Peterson, and in another part it states, that this policy was
cancelled July 24, 1882, which was the true date of its cancel-
lation and was subsequent to the service of the garnishee-
summons.

There was, as we have seen, no verbal agreement of any sort
between Peterson and Alderson on June 30, 1882. Alderson
simply notified Peterson, that he was going to get the poli-
cies of this company from his customers for cancellation
as fast as he could.    Peterson did nothing whatever then
and agreed to nothing then as agent for the company or
personally.    He simply gave his assent to what Alderson
proposed to do on behalf of his costomers, an assent which
amounted to nothing whatever legally, as these customers
had a right to do what Alderson proposed should be done
by them without any assent thereto by the company or by
Peterson.    The company had expressly given their assent
thereto on the face of the policy, when it was issued.    When
August Hartfe, for instance, returned his policy to the com-

pany or its agent Peterson for cancellation on July 24, 1882, he without any assent thereto on the part of the company or its agent at once became entitled to demand of the company the return-premium, which was in that case $9.16. This case is an illustration of the position of all of these return-premiums in dispute amounting to $225.48. From what has been said it is clear, that Peterson as garnishee in this case was entitled to no credit for any part of this $225.48, and if none was allowed him, and he was charged with the whole amount, which he owed to the company on July 8, 1882, when the garnishee-summons was served on him, he was not thereby wronged by the court below. But it is claimed he was not liable as garnishee for anything which he owed the company on July 8, 1882, because what he owed was all for premiums collected by him as agent of the company, and that such an agent, and indeed agents generally are not liable for moneys received by them for their principals, till demand has first been made of them by their principals; that the obligation, which they assume, when they become agents, is to account for the moneys they collect, and they must be first called upon to account, before they can be sued; and that it is a universal rule, that an attaching creditor can have no greater rights against the garnishee, than the defendant had before the garnishee-summons was served; that he simply steps into the shoes of the defendant and prosecutes for him; that the credit or property of the garnishee may be subjected to the payment of such judgment as may be obtained against the attached debtor. Now to sustain the premises, that The Home Insurance Company had on July 8, 1882, no right of action against their general agent Peterson, though on settlement he was then indebted to them, because they never had made a demand on him for a settlement, the attorney for the plaintiff in error cites the following authorities: *Judah* v. *Dyott*, 3 Blackf. 324; *Lally* v. *Capps*, 1 Ala. 121; *Taylor* v. *Spears*, 1 Eng. 382; *Cockrill* v. *Kirkpatrick*, 9 Mo. 695, 697, 704; *Waring* v. *Richardson*, 11 Ind. L. 77; *Hedder* v. *Younglove*, 46 Ind. 212. I have examined these cases and they go far to sustain the position, that on July 8, 1882, The Home Insurance Company could not have brought an action against its general agent, in West Virginia, W. F. Peterson, because it

never had made a demand on him for a settlement. Other authorities however may be found, from which perhaps it might be inferred, that such an action might lie without any previous demand, for example see *Coffin* v. *Coffin,* 7 Me. 298. But I have deemed it unnecessary to examine this question or to form any definite opinion on this point, as I am satisfied that Peterson as general agent of the company could be legally garnished for his indebtedness to them, when the summons was served, though they never had demanded a settlement of him or made any other demand upon him. On this subject Warples in his work or Attachment and Garnishment, ch. 6, close of sec. 4 p 218 says :

" When the defendant has property or funds in the hands of sheriff, constable, administrator, executor, attorney, agent, bailee, or trustee, under such circumstances, that he can not institute suit for it without pievious notice or demand, such property or funds, if otherwise liable to be subjected to garnishment, can not be exempted for want of such preliminary action on the part of the defendant; for if so he might foil the thrust of the creditor by purposely avoiding the giving of notice or the making of the demand. The general rule is that the creditor has no greater rights against the garnishee than the defendant had before the summons; that he steps into the shoes of the defendant and prosecutes for him, that the credit or property of the latter may be subjected to such judgment as may be obtained against him ; but here it is a reasonable exception, so manifestly just that the opposite course is clearly seen to defeat the purposes of justice."

These views expressed by Waples appear to be sustained both by reason and authority, so far at least as an attorney, agent, bailee or trustee is concerned, though under some circumstances money in the hands of a sheriff, constable, administrator or executor is not subject to garnishment, because it is regarded as in the custody of the law. (*Staples* v. *Staples, &c., Trustee,* 4 Me. 532 ; *Woodridge et al.* v. *Moon & Dale,* 5 N. H. 519 ; *Quigg* v. *Kitredge,* 18 N. H. 137 ; *Corey* v. *Powers, &c., Trustee,* 18 Vt. 588 ; *Thayer* v. *Sherman & Adams,* 12 Mass. 441 ; *Riley* v. *Herst,* 2 Pa. St. 346.) There may be deduced from these and other cases other reasons than those assigned by Warples, why, when a defendant has property or funds

in the hands of another, though it may be under such circumstances, that he can not institute a suit for it without previous notice or demand, such property or funds will never be exempt from garnishment, merely because the defendant has not given such notice or made such demand.

One of these reasons is that in most of these cases, where such notice or demand is necessary, before the creditor can sue the garnishee, from the nature of the indebtedness of the garnishee it would be unreasonable to subject him to the costs and annoyance of a suit, till he had been called upon to account. But the issuing of a summons against one as a garnishee is not properly speaking a suit, whereby he can be subjected to any costs, if he discloses thereby the amount of his indebtedness to the non-resident defendant; on the contrary in such a case he recovers his costs. It is only when the plaintiff alleges, that he has not made a full and fair disclosure of his indebtedness to the defendant, that this proceeding becomes a hostile suit. The issuing of the garnishee-process is really nothing but a substitute for the defendant's demand on him before suit brought. The defendant has to make this demand before he can under certain circumstances subject him to the costs of the suit; and if a creditor of the defendant garnishes him, he is not subject to any costs, until after the demand to account is made on him in open court. It is therefore in such cases no hardship on the garnishee, that he has been summoned as garnishee, before any demand has been made on him. This demand is made on him in open court, before the proceeding becomes a hostile suit; and he is thus in no worse position, than he would have been in, had he never been summoned as a garnishee. (*Quigg* v. *Kitredge*, 18 N. H. 139; *Corey* v. *Powers, &c., Trustee*, 18 Vt. 590.)

There is still another reason urged by the counsel for the plaintiff in error, why he was not liable to be summoned as a garnishee in this case. We have stated, that it is the general rule, that a garnishee is not chargeable, unless the defendant could recover of him, what the plaintiff seeks to secure by garnishment, and it follows therefore that a contingent liability of a contract affords no ground for garnishment. The cases will illustrate what is meant by a contingent liability in this connection. Thus it is a very usual thing for

a railroad company to contract for the building of its road
and by the contract to require the contractor to do his work
by a specific time, to provide, that, if he should not put force
enough on the road to comply with his contract in this re-
spect, the engineer of the railroad company may employ a
force sufficient for the purpose and pay such force out of the
price contracted to be paid to the contractor for the work.
The company also retains a portion of the pay of the con-
tractor as an indemnity against any loss by the non-compli-
ance of the contractor with his contract, usually also provid-
ing, that, if the contractor neglect his work, the company may
declare the contract void.   If, while such a contract is still
subsisting, the contractor abandons' his work, what may be
supposed to be due him can not be garnished in the hands
of the railroad company, for such debt is contingent, and it
may turn out, that by reason of the subsequent cost of com-
pleting his contract, the apparent debt due to him from the
railroad company will be extinguished.   (*Straus* v. *Railroad
Company*, 7 W. Va. 368; *Baltimore & Ohio Railroad Company*
v. *Gallaher's Adm'r.*, 14 Gratt. 563; *Williams* v. *Androscoggin
& Kennebec Railroad Co.*, 36 Me. 201.)   So a sailor's wages,
which are contingent upon the voyage being successful, can
not be attached or garnished till the voyage is complete.
(*Davis et al.* v. *Hundel et al.*, 3 Mass. 33; *Wentworth* v. *White-
mon*, 1 Mass. 470.)   So the maker of a negotiable note can
not be garnished; for the note being payable to order, it is
contingent to whom he owes the debt.   (*Parker* v. *Dansforth*,
16 Mass. 299; *Athens* v. *Prescott*, 10 N. H. 120; *Peck* v.
*Brannon*, 24 Vt. 75.)   So an insurance company can not be
made a garnishee, while it has the option to rebuild the
burned property or pay its value; for such liability is contin-
gent and never will exist if it elect to rebuild.   (*Martz* v. *The
Detroit Fire & Marine Insurance Company*, 28 Mich. 201.)

I have seen no case where the defendant was an insurance
company and the garnishee its agent.   The nearest approach
to such a case is *Haven* v.   *Wentworth*, 2 N. H. 93.   In this
case Brown and Wentworth were both members of an insur-
ance association, and Wentworth was its principal agent, to
whom all the premium-notes were made payable, and they
were always retained in his custody as a fund to indemnify

those who might sustain losses on policies subscribed in their office by the respective members of the association. An account was opened with each member by Wentworth, the general agent, in which he was credited with all notes received on his insurances and debited with all notes returned, when policies had not attached, with all losses on policies by him subscribed in the office, and with his due proportion of the annual expenses of the association. This was the established usage. Wentworth was garnished as a debtor of Brown, and when the garnishee-summons was served, Wentworth as such general agent according to the books apparently owed Brown; but after the service of the summons the books no longer showed a balance due Brown, because losses on policies then existing, for which Brown was responsible, had been incurred after the garnishee-summons was served, the losses arising from certain premium-notes turning out of no value and Brown's share of the annual expenses more than absorbed the apparent balance due him on the books, when Wentworth was summoned as garnishee. Wentworth claimed as agent of the association the right to appropriate what was apparently due to Brown on his books, when collected, to the payment of demands, which originated against Brown in the association, before he should pay anything to the attaching creditor of Brown. On this state of facts the court say on page 95:

"After some hesitency we are inclined to the opinion that the garnishee ought to be discharged. The origin of the Insurance Association, the office held by the garnishee, the form of taking the premium-notes, the invariable usage and understanding as to the disposition of the notes which was in itself reasonable and had been recognized by the principals, all indicate that the credits of each member on the agent books were merely hypothetical and contingent. They were always subject to a deduction of all his premium-notes returned, his proportion of the current expenses of the association, and the amount of his losses on policies subscribed in that office. No member would consider his interest in the apparent credit upon the books, as absolute; he would rather regard it as a contingent fund, subject to be reduced, or even extinguished, according to the

extent of the above deductions; and consequently the fund would be bound by the usage. ( 9 Mass. 155; 10 Mass. 26 ; 11 Mass. 85; 7 Mass. 43; 1 Johns. 230; 1 B. and B. 232.) Regarding the fund as a debt it was so fast as the premium-notes are collected, subject to particular appropriations; and before the last disclosure, there appropriations had been made to the amount collected. The garnishee cannot be charged with the uncollected notes obviously. An additional reason, which is paramount to all others, and which characterizes the whole case, is, that the premium-notes, whether uncollected or collected are upon the disclosure to be considered as a qualified pledge for specific purposes; and till those purposes are accomplished they cannot be reached in the hands of the agent."

I have stated this case at some length giving the reasoning of the court almost in the language which it used, because it has more points of resemblance to the case before us than any other I have seen. The association was not, as in the case before us, as I understand, a corporation but a private association for the purpose of insuring the members of the association only. While the character of the insurance is not stated, yet I persume it was a life-insurance, which was issued to each member. The premiums were not paid in cash; but premium-notes were given, and they were made payable to their general agent Wentworth, who kept a book, in which he opened an account with each member, and in his account he credited the member with all his premium-notes, as if they were cash paid by him, and debited him by any of his premium-notes which might be returned to him, which return of premium-notes, I understand, was made from time to time to the members, when there were more premium-notes on hand than was deemed necessary to meet life-policies which by death might fall due. Each member was also debited by all losses on policies by him subscribed, from which I suppose each member had a right to take out life-policies for others than himself probably for members of his family, and was also debited by his due portion of the annual expenses of the association. The accounts and liabilities of the parties on this basis were tacitly agreed to by all the members of the association. There was

no by-law fixing their liabilities in this manner; but it was
so understood by all and was the invariable usage of the as-
sociation.   Now it is obvious that a balance in favor of any
member on the books at any specific time would not neces-
sarily indicate a debt due to him; for what was apparently due
him might have to be appropriated the next day on policies
by him subscribed, if any life so insured should happen to
terminate, and was likewise liable to be diminished by the
other future appropriations, which the fund to his credit
would have to help to make up, such as the future expenses
of the association.  How rapidly this fund might disappear was
entirely contingent, depending on the uncertain life of the
members and others who had life-policies.  It is obvious there-
fore that what the association might from the books be sup-
posed to owe any member was really and not simply appar-
ently a contingent debt; and hence the court very properly
decided that a creditor of one of the members of this associ-
ation could not garnish the debt, which on the books of
the general agent of the association was due to this member,
as it was really a mere contingent debt liable to be extin-
guished at any time.   In point of fact the debt apparently
due to the member attached was in this case entirely extin-
guished, before the court was ready to decide the case.

In all the other cases I have examined, including those
cited, the debt, which was garnished, was still more obviously
contingent; and in them all it would have been obviously un-
just, if the garnishee had been required to pay a debt, which
might afterwards be extinguished or diminished by contin-
gent future events, to which it was subject at the time, when
he was summoned as garnishee.   It would have been a very
different case, if the indebteness of the garnishee when sum-
moned had not really been contingent liable to be diminished
or extinguished by future events, to which under the contract,
by which he owed the debt, it was subject.

In the case before us the debt due from William F. Peter-
son, the garnishee, to The Home Insurance Company of Co-
lumbus, Ohio, when the garnishee-summons was served upon
him, was really not contingent, and the appearance of con-
tingency was given to it only by the mode, in which he and
his principal, The Home Insurance Company, for their con-

venience kept their books. Whenever Peterson, as general agent of the company for West Virginia, procured any person to insure his property in this company, he bargained with him, and the premiums to be paid annually on the property for the term of years, for which it was to be insured and the amount of the insurance were agreed upon; and of this bargain he notified his principal, this company at Columbus, Ohio; and thereupon they sent him a blank policy signed by the president and secretary of the company at Columbus, Ohio, which was inoperative, till it was countersigned by Peterson. This he did, when the first premium was paid by the person, whose property was to be insured; and on this payment he delivered the policy. It would not often happen, that this person would fail to pay this first premium, and much more rarely that he would fail to pay promptly his subsequent annual premiums, as by any such failure by the terms of the policy it became forfeited. Hence it was a convenient mode of keeping the books for The Home Insurance Company of Columbus, Ohio, to charge these premiums as received by William F. Peterson, their general agent in Wheeling, when they became due, without being notified that they were actually received by him; and he did not notify them of these receipts. But if in any case any one insured failed to pay his premiums, whether it was his first premium or any subsequent one, Peterson notified the company at Columbus, Ohio, of such failure; as they had charged him on their books with the receipt of this premium taking for granted he had received it, they of course credited him by the amount of such premium not actually received by him. Peterson also for the mere convenience of the company paid out of funds of theirs in his hands the return-premiums to any person insured, who might wish to have his policy cancelled. This any person by the terms of the policy had a right to do, and when it was done, the company was bound to refund to him a certain amount after retaining of what had been paid a sum amply sufficient to compensate them for the risk they had run. There was no sort of obligation on Peterson to pay this return-premium to parties, who had their policies cancelled. He did so, where the policies had been procured from him, merely as a matter of convenience

to all the parties.   When he did so and notified the company, that he had done so, they of course on their books kept at Columbus, Ohio, credited him by the amount he had so paid for them.

These things and these only, so far as I understand, are what are claimed to render the indebtedness of Peterson to this company at any given time contingent; but I am unable to see, that they have any such effect.   He was liable for the premiums which he actually received, when he countersigned and delivered policies, and for the annual premiums, which he afterwards actually received. · He was entitled to a credit for the moneys which he actually paid for the company on the cancellation of policies.   He was neither chargeable with these premiums properly in any case till they were actually received, nor was he entitled to credit for these return-premiums received by him on the cancellation of policies till he actually paid them.   If he was charged occasionally with a premium upon the assumption, that he had received it, this did not increase his indebtedness, although it was apparently greater on the books of the company than it really was; but that was at once rectified the moment he notified the company, that he had not received a premium when it became due.   As for these return-premiums they were credited to him, as soon as he notified the company, that he had cancelled a policy and paid such return-premium.   The amount due from Peterson, the general agent of The Home Insurance Company, July 8, 1882, at 10 o'clock A. M., when this garnishee-summons was served on him, was a sum perfectly definite and fixed, which could neither be extinguished nor decreased by any future events under his contract of agency; though of course his future transactions in doing the business of the company might make his indebtedness either greater or smaller.   But as the plaintiff had a lien on Peterson's indebtednes to this company on July 8, 1882, Peterson could not subsequently diminish the indebtedness by paying for the company return-premiums to persons subsequently cancelling their policies or by paying any other debts of the company.

The indebtedness of Alderson for premiums due from his customers was not an indebtedness of Alderson to The Home

Insurance Company but was an indebtedness to Peterson personally; and the book, which he kept, shows that Peterson so regarded it. For the convenience of Alderson and Peterson, who had large dealings together, Peterson did not require of Alderson as an insurance-broker to pay to him in cash each separate premium of each of his customers on the day it fell due, but it was charged up by Peterson, as if actually paid in cash by the insured on the day it fell due, and he then charged this amount in his account with Alderson as so much cash advanced to him, and settled with him from time to time as was convenient.

It is then obvious that neither Alderson nor his customers owed The Home Insurance Company anything at any time, but these premiums were due to the company from Peterson their general agent, and they were, I presume, properly charged to him by the judge of the municipal court in Wheeling in ascertaining his indebtedness to the company on July 8, 1882. The difficulty in ascertaining the exact amount due from him then did not arise from his debt being contingent, but it arose from the confused and unintelligible manner, in which the books and memoranda, which he had, were kept; and the difficu'ty, I suppose, was not a little increased by the numerous alterations, which appear to have been made in these books. So far as I can judge from such material, William F. Peterson, the garnishee, was not wronged, when the municipal court of Wheeling charged him with $475.00 as the amount, which was due from him on July 8, 1882, when he was served with the garnishee-process. If there be some uncertainty as to whether this is the correct sum, he can not complain, as it results from his mode of keeping his accounts and memoranda. The plaintiff has, I think, much more right to complain of this uncertainty.

The attachment in this case appears to be dated June 7, 1882, instead of July 7, 1882, but this is of no moment, as it was obviously a mere clerical mistake as shown by other parts of the record. It was undoubtedly issued on July 7, 1882. It is therefore unimportant as it can not vitiate proceedings, which are in all other respects correct.

For these reasons the judgment of the municipal court of Wheeling in favor of the plaintiff against William F. Peter-

son rendered December 17, 1883, must be affirmed with damages according to law.

AFFIRMED.

---

# CHARLESTON.

